## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| YORK MARINE, INC., | ) | |
| | ) | |
| Plaintiff and Counter-Defendant, | ) | |
| | ) | |
| v. | ) | **2:15-cv-00184-JDL** |
| | ) | |
| M/V *INTREPID*, *in rem*, | ) | |
| | ) | |
| Defendant, Third-Party Plaintiff, and Counter-Claimant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOHN T. WILSON, *in personam*, | ) | |
| | ) | |
| Defendant, Third-Party Plaintiff, and Counter-Claimant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MICHAEL YORK, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## ORDER ON YORK MARINE, INC. AND MICHAEL YORK'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

This case involves an action by York Marine, Inc. ("York Marine") to foreclose on a maritime lien against the vessel M/V *Intrepid* (the "Vessel") based on claims of breach of contract and unjust enrichment against Defendant John T. Wilson, the owner of the Vessel. ECF No. 9. York Marine provided storage, repair, and maintenance services for the Vessel, for which it contends it has not been fully paid. ECF No. 64 at 1-2. Wilson contends that York Marine is responsible for the Vessel partially sinking while on a mooring in Rockland Harbor and disputes some of the

charges billed by York Marine and whether repairs to the Vessel were properly or fully performed.  ECF No. 83 at 1-5.  He has brought counterclaims and third-party claims against York Marine and Michael York, respectively, for negligence, breach of warranty of workmanlike performance, fraud, conversion, and violation of the Maine Unfair Trade Practices Act ("UTPA"), 5 M.R.S.A. § 205-A *et seq.* (2016).  ECF No. 14.

In their motion for partial summary judgment, York Marine and Michael York assert that they are entitled to judgment as a matter of law on (1) whether Wilson has sufficient interest to bring the counterclaims and third-party claims that he asserts; (2) Wilson's claims of conversion and unfair trade practices against York Marine; and (3) Wilson's claims of negligence, conversion, and unfair trade practices against Michael York in his individual capacity.  ECF No. 64.  For the reasons I will explain, I grant the motion in part and deny the motion in part.

## I.  FACTUAL BACKGROUND

York Marine is a shipyard in Rockland that provides construction and repair services.  ECF No. 65 at 1, ¶ 1; ECF No. 84 at 1, ¶ 1.  Michael York is the principal shareholder of York Marine.  ECF No. 65 at 1, ¶ 2; ECF No. 84 at 1, ¶ 2.  The Vessel is a motor yacht that was built by York Marine.  ECF No. 65 at 2, ¶ 3; ECF No. 84 at 1, ¶ 3.  Wilson owns the Vessel and uses it solely as a pleasure yacht.  ECF No. 65 at 2, ¶ 4; ECF No. 84 at 1, ¶ 4.

On June 13, 2014, the Vessel was swamped during a storm while on a mooring in Rockland Harbor and partially sank.  ECF No. 65 at 2, ¶ 6; ECF No. 84 at 2, ¶ 6 and 4, ¶ 30; ECF No. 91 at 2, ¶ 30.  At the time, the Vessel was insured by AIG Marine

Specialty Claims ("AIG").   ECF No. 65 at 2, ¶ 5; ECF No. 84 at 1, ¶ 5.   A local contractor salvaged the Vessel.   ECF No. 65 at 2, ¶ 7; ECF No. 84 at 2, ¶ 7.   After the casualty, Wilson tendered the claim to AIG, and AIG paid the salvor.   ECF No. 65 at 2, ¶¶ 8-9; ECF No. 84 at 2, ¶¶ 8-9.   York Marine asserts that AIG also paid it for stabilizing the yacht post-loss and for repairing the yacht to its pre-loss condition. ECF No. 65 at 2, ¶ 10.   Wilson disputes this, asserting that the Vessel has not been restored to its pre-loss condition and that AIG has not paid York Marine to reattach the swim platform, which was torn off as part of the sinking, to properly rebuild the engine, nor to fix the core damage in the deck.   ECF No. 84 at 2, ¶ 10.   The parties do not dispute that AIG has paid York Marine a total of $214,805.63.   ECF No. 65 at 3, ¶ 11; ECF No. 84 at 2, ¶ 11.

The Vessel was put back in commission after the repairs, and Wilson ran the Vessel from Rockland to Belfast and back, after which he messaged York Marine that the boat ran well.   ECF No. 65 at 3, ¶¶ 13-14; ECF No. 84 at 2, ¶¶ 13-14.

The AIG policy that Wilson purchased indemnifies Wilson for loss or damage to the Vessel, and provides:

> If we make a payment under this policy and the person to or for whom payment was made either recovers or has the right to recover from another for the covered loss, we will be subrogated to that right; however, our right to recover is subordinate to the insured's right to be fully compensated.

ECF No. 65 at 3, ¶ 15; ECF No. 84 at 2, ¶ 15.   AIG's surveyor, Neil Rosen, approved the repairs and made a final inspection of the Vessel on April 17, 2015, before AIG made its final payment to York Marine.   ECF No. 65 at 3, ¶¶ 16-17; ECF No. 84 at 2,

¶¶ 16-17 and 7, ¶ 60 (citing ECF No. 65-6 at 116).   York Marine asserts that Rosen's final inspection was fully satisfactory.   ECF No. 65 at 4, ¶ 18.   However, Wilson disputes this, asserting that Rosen was told that the engine had been rebuilt, when it had not been, and that if Rosen had been told that the engine had not been rebuilt, "a fact finder may infer that he would have found the repairs unacceptable."   ECF No. 84 at 3, ¶ 18 and 7, ¶¶ 61-64.   York Marine denies that Michael York told Rosen that the engine was rebuilt.   ECF No. 91 at 6, ¶ 61.

Prior to the final payment by AIG to York Marine, Wilson signed a release agreement required by AIG as a condition of making final payment under the policy. ECF No. 65 at 4, ¶ 19; ECF No. 84 at 3, ¶ 19 and 5, ¶¶ 42, 43-44.   The agreement stated:

> I/We hereby assign, transfer, and set over to the insurer any and all claims or causes of action of whatsoever kind and nature which I/we now have, or may hereafter have, to recover against any person or persons as the result of said occurrence and loss above described, to the extent of the payment above made; I/we agree that the insurer may enforce the same in such manner as shall be necessary or appropriate for the use and benefit of the insurer, either in its own name or in my/our name . . . .

ECF No. 65-3 at 7.   Wilson's AIG claim was subject to a $1,850 deductible.   ECF No. 84 at 9, ¶ 83; ECF No. 91 at 8, ¶ 83.

The parties dispute many of the facts surrounding how the Vessel came to be on the mooring where it sank, why it sank, what the damage was, the extent to which repairs were made and paid for, and other events subsequent to the sinking.   Wilson asserts, and York Marine denies, that during the storm and upon the request of the owner of the dock where the Vessel was kept, York Marine moved the Vessel to the

mooring.  ECF No. 84 at 3, ¶ 27; ECF No. 91 at 2, ¶ 27.  Wilson also asserts, and York Marine denies, that the York Marine personnel who moved the Vessel failed to ensure that its bilge pumps were activated, and that if the bilge pumps had been activated, the Vessel would not have sunk.  ECF No. 84 at 4, ¶¶ 28, 32; ECF No. 91 at 2, ¶¶ 28, 32.  Wilson also contends that on the day of the sinking, Michael York called him, while both were on land, and told him that the Vessel's bilge pumps were activated and pumped until the batteries were discharged and that another vessel had allided with the Vessel, causing it to sink.  ECF No. 84 at 4, ¶¶ 33-36.  York Marine does not dispute that Michael York called Wilson and informed him of the sinking on the day of the sinking and that both were on land during the call.  ECF No. 91 at 2, ¶¶ 33, 34. But it denies that Michael York told Wilson that the Vessel's bilge pumps were activated and pumped until the batteries were discharged, and it asserts that it was in a later call that Michael York told Wilson that another vessel had allided with the Vessel, causing it to sink.  *Id.* at 2-3, ¶¶ 35, 36.

Wilson further contends that York Marine relaunched the Vessel in August 2014 before the insurance repairs were complete and that the engine experienced a problem with the cooling system.  ECF No. 84 at 5-6, ¶¶ 45-46.  York Marine admits that at the time of the relaunch, several insurance-related items remained to be completed, though it qualifies that "[m]inor punch list items remained[,]" and admits that the engine experienced a problem with the cooling system.  ECF No. 91 at 4, ¶¶ 45-46.

Wilson asserts that later in the fall of 2014, Wilson met with Michael York to discuss a list of work (the "winter work list") to be completed once the insurance repairs were completed and that he explained that he was concerned about the remaining insurance work and wanted the Vessel's engine to be checked before York Marine began any additional work. ECF No. 84 at 6, ¶¶ 48-49. York Marine qualifies that there was no agreement that the winter work list items would be made only after the insurance items were complete and, though it admits that there was discussion of the remaining insurance work, denies that Wilson wanted the engine checked. ECF No. 91 at 4, ¶¶ 48-49. Wilson also asserts that he asked Michael York to provide a price quote for the winter work list but did not receive it, and that Michael York proceeded to complete the insurance work while beginning on the winter work list. ECF No. 84 at 6, ¶¶ 50-51, 53-54. York Marine asserts that Michael York did not provide a quote for the winter work list because Wilson never asked for one. ECF No. 91 at 4-5, ¶¶ 50-51, 53-54. Wilson asserts, and York Marine denies, that York Marine then demanded payment for work that was not authorized by Wilson. ECF No. 84 at 7, ¶ 55; ECF No. 91 at 5, ¶ 55. Wilson asserts, and York Marine denies, that once York Marine became aware that Wilson was disputing some of the invoices, York Marine submitted several other invoices for claimed non-insurance work. ECF No. 84 at 7, ¶ 56; ECF No. 91 at 5, ¶ 56.

The parties also dispute whether, on March 19, 2015, Wilson demanded that Michael York release the Vessel so that York Marine's charges could be verified. ECF No. 84 at 7, ¶ 57; ECF No. 91 at 5, ¶ 57. The parties do not dispute that on March

20, 2015, Michael York refused to release the Vessel.  ECF No. 84 at 7, ¶ 58; ECF No. 91 at 5, ¶ 58.  Wilson asserts, and York Marine denies, that once Michael York finally allowed Wilson to inspect the Vessel, Wilson found that several of the items for which York Marine was charging him could not be verified and that York Marine was overcharging him for some items.  ECF No. 84 at 7, ¶ 59; ECF No. 91 at 5-6, ¶ 59.

Wilson asserts, and York Marine denies, that it will cost between $25-75,000 to repair the damage to the Vessel's deck and that the engine is currently worth about one-third of its pre-sinking value of $30,000.  ECF No. 84 at 8, ¶¶ 70, 72; ECF No. 91 at 7, ¶¶ 70, 72.  The parties also dispute Wilson's assertion that it will cost about $45,000 to cut out, rebuild, and reinstall the Vessel's engine.  ECF No. 84 at 9, ¶ 85; ECF No. 91 at 9, ¶ 85.  Wilson further asserts that AIG did not pay to rebuild the engine or repair the damaged core in the deck and that AIG was not billed for and did not pay to reattach the swim platform to the Vessel's transom.  ECF No. 84 at 8, ¶¶ 73-75.  York Marine admits that AIG did not pay to rebuild the engine or repair the damaged core but asserts that the core is not damaged and that York Marine billed AIG to repair the swim platform, though it did not bill AIG to secure the platform in the method that Wilson specified.  ECF No. 91 at 7-8, ¶¶ 73-75.

## II. SUMMARY JUDGMENT STANDARD

### A.    Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir.

7

2014).  "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'" *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has potential to determine the outcome of the litigation." *Id.* (citing *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007).  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Id.* (citing *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006)) (internal quotation marks and emphasis omitted); Fed. R. Civ. P. 56(c).  "[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (internal quotation and citation omitted).

**B.     Local Rule 56**

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district.  *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id.*  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id.*  The nonmoving party may also submit its own statement of additional material facts that it contends are not in dispute, each supported by a specific record citation.  *See id.*  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts, in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id.*

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation

to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## III. LEGAL ANALYSIS

### A.   Whether Wilson May Bring His Counterclaim and Third-Party Claim

York Marine contends that Wilson cannot bring his counterclaims and third-party claims because AIG, his insurer, indemnified him for the claimed damages and he expressly signed over to his insurer all rights and claims that he may have had in relation to the matters alleged in his counterclaims and third-party claims. ECF No. 64 at 2-3. Therefore, York Marine argues, AIG is the real party in interest to the extent that Wilson received indemnification. *Id.* at 3. Wilson counters that his insurer is only partially subrogated; that is, he has not been paid the full amount of the damages that he claims and, therefore, he can bring the claims in his own name, whether or not his insurer, AIG, participates. ECF No. 83 at 6-7. Wilson asserts that AIG has only paid a portion of his claim because (1) his AIG claim was subject to a $1,850 deductible; (2) his claim for damages for the Vessel's diminution of value is not covered by the AIG policy; and (3) AIG has not paid to fix all of the damage related to the sinking, including the cost of rebuilding the engine, reattaching the swim

platform, and repairing the core damage in the deck. *Id.* at 9-11. I first address the scope of the subrogation and assignment between Wilson and his insurer, AIG.

Under Wilson's policy, once AIG makes a payment under the policy, AIG is subrogated to any recovery or right to recover by the person paid against a third party. *See* ECF No. 65-5 at 16. Pursuant to the release agreement that Wilson signed, Wilson assigned any claim that he might have against a third party "to the extent of the payment above made[.]" ECF No. 65-3 at 7. Wilson was, however, subject to a $1,850 deductible. ECF No. 84 at 9, ¶ 83 (citing ECF No. 65-3 at 2, ¶ 5 and 6); ECF No. 91 at 8, ¶ 83. At the hearing held on July 21, 2016, York Marine acknowledged that Wilson retains a claim against it for the deductible, but argues that he has otherwise assigned his claim to AIG. Oral Arg. Hr'g, July 21, 2016. I conclude that the assignment to AIG excluded the deductible, and Wilson may therefore pursue damages in that amount against York Marine in relation to the alleged damage to the Vessel. *See Axis Ins. Co. v. Hall*, 287 F.R.D. 110, 111-12, 116, 118 (D. Me. 2012) (recognizing that the insured, who was paid by the subrogee insurance company the total loss amount minus a $5,000 deductible, could join the insurer's subrogation action against a contractor for property damage to the insured, if brought in state court, to pursue a claim for the deductible).

Wilson cannot pursue, however, damages for any alleged diminution in value of the Vessel, in addition to damages for the cost of any remaining needed repairs. The First Circuit has recognized:

> The measure of damage in maritime collision cases is expressed by the maxim *restitutio in integrum*. While under this rule the measure of

> damage is the difference in value of the vessel before and after the collision, the cost of necessary repairs and the loss of earnings during repair have been regarded as the equivalent.

*Pinto v. M/S Fernwood*, 507 F.2d 1327, 1331 (1st Cir. 1974) (citations omitted). Wilson claims and seeks damages for diminution in value apart from the cost of repairs but provides no authority for the proposition that he can recover the former in addition to the latter. Oral Arg. Hr'g, July 21, 2016. In addition, damages are not available for the loss of use of a private pleasure boat. *Northern Assur. Co. of Am. v. Heard*, 755 F. Supp. 2d 295, 297-99 (D. Mass. 2010) (citing *The Conqueror*, 166 U.S. 110 (1897)) (stating that the categorical ruling in *The Conqueror* that recreational loss is not compensable continues to be binding). Wilson admits that he uses the Vessel solely as a pleasure yacht. ECF No. 65 at 2, ¶ 4; ECF No. 84 at 1, ¶ 4. The damages that Wilson can recover, therefore, are limited to the cost of repairs.

Wilson also maintains that AIG has not paid to fix all of the sinking-related damage to the Vessel. ECF No. 83 at 9. He asserts that the engine still has not been rebuilt, the costs related to reattaching the swim platform have not been paid by AIG, and AIG has not paid to fix the core damage in the deck. *Id.* As far as the swim platform is concerned, counsel for Wilson and the Vessel stated at the Local Rule 56(h) conference held in this case that they were not pursuing liability on the basis of the swim platform because it was not known how the platform came off the Vessel, and the Court's report of the conference and order adopted this admission. *See* ECF No. 61 at 2 ("Statement of Issues: . . . Defendants will not seek to establish liability on the basis of (1) the vessel's swim platform[.]"). Only later did Wilson assert that

"York Marine personnel struck [the Vessel's] swim platform, compromising it and causing it to tear off."   ECF No. 83 at 4.[1]   Wilson is bound to his admission. Accordingly, no damages can be pursued for claimed damage to the swim platform or damage otherwise related to claimed defects in the swim platform.

With respect to the engine and the deck core, Wilson contends that he is making these claims independent of what was paid for by AIG.  ECF No. 83 at 9. York Marine does not address the claimed additional damages beyond what AIG paid, other than for diminution in value or loss of use, *see* ECF No. 64 at 2-8; ECF No. 90 at 2-4, focusing its argument on whether Wilson has sufficient interest to bring his counterclaims and third-party claims.[2]

Wilson has cited evidence that, with all reasonable inferences in his favor, is at least sufficient to create genuine issues of material fact regarding the claimed additional engine, *see* ECF No. 84 at 7-8, ¶¶ 61-67, 71-72 (citing ECF No. 65-6 at 64-66; ECF No. 84-4 at 4, ¶ 28; ECF No. 84-7 at 10-11, 18, 19; ECF No. 65-2 at 26-28, 57-59), and deck repair damages, *see id.* at 2, ¶ 10 (citing ECF No. 65-7 at 46-49) and 8, ¶ 69 (citing ECF No. 65-7 at 47).  Therefore, Wilson can pursue a claim against York Marine for damages for repairs that he claims are necessary in connection with

---

[1] Further, the only record citation for this assertion is a paragraph in Wilson's declaration that itself indicates no source or support for Wilson's knowledge or assertion of this fact.  ECF No. 84 at 4-5, ¶ 38 (citing ECF No. 84-4 at 2, ¶ 13).

[2] By signing the release, Wilson assigned to AIG "any and all claims . . . to recover against any person or persons as the result of said occurrence and loss above described, to the extent of the payment above made[.]" ECF No. 65-3 at 7.  Pursuant to those terms, Wilson only assigned his claim to recover against York Marine to the extent of AIG's payment to York Marine of $214,805.63.

the sinking and that are above the amount paid by AIG, as well as for the $1,850 deductible.

## B. Conversion

Under Maine law, to make a *prima facie* case of conversion, a plaintiff must show the following three elements: (1) that the person claiming that his property was converted has a property interest in the property; (2) that he had the right to possession at the time of the alleged conversion; and (3) that the party with the right to possession made a demand for its return that was denied by the holder. *Surplec, Inc. v. Me. Pub. Serv. Co.*, 501 F. Supp. 2d 195, 198 (D. Me. 2007) (citing *Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798).

York Marine contends that Wilson cannot establish a conversion claim because he had no right of possession of the Vessel at the time of the alleged conversion due to unpaid bills that he owed to York Marine and because he failed to make a demand for its return.  ECF No. 64 at 12-13.  In response, Wilson asserts that: (1) the charges based on which York Marine claims its possessory lien are "unproven and unsupported"; (2) the damage that York Marine caused to the Vessel by, as alleged, arranging to have the Vessel placed on the mooring during a storm and without activating its bilge pumps, far outweighs the value of any services that York Marine did provide; and (3) York Marine was required to pursue arrest of the Vessel by court order, not simply seize it.  ECF No. 83 at 15.

Contrary to Wilson's argument, York Marine had a possessory lien on the Vessel for the value of the unpaid services because it had the Vessel in its possession

and had not been fully paid for the services that it provided. *See Gen. Motors Acceptance Corp. v. Colwell Diesel Serv. & Garage, Inc.*, 302 A.2d 595, 596-97 (Me. 1973) ("It is a well-settled principle of the common law that he who by labor, skill or materials adds value to the chattel of another whether under an express or an implied agreement has a possessory lien thereon for the value of his services and materials, and may retain the chattel in his possession until the same be paid.") (citation omitted); *see also The General Smith*, 17 U.S. (4 Wheat.) 438, 441 (1819) ("A ship-wright who has taken a ship into his possession to repair it, is not bound to part with the possession until he is paid for the repairs[.]"); *Am. Trust Co. v. W. & A. Fletcher Co.*, 173 F. 471, 473 (1st Cir. 1909); *The City of Miami*, 265 F. 427, 428 (D. Mass. 1920); *The Two Marys*, 16 F. 697, 699-700, 701 (S.D.N.Y. 1883).

Wilson contends that the value of the services that York Marine performed is in dispute, asserting that several of the items for which York Marine was charging him could not be verified or York Marine was overcharging him.  ECF No. 83 at 15 (citing ECF No. 84 at 7, ¶ 59 (citing ECF No 84-4 at 3-4, ¶¶ 26-27)).  But he does not suggest that all of the unpaid bills that caused York Marine to hold on to the yacht were invalid, and he cites no authority for the proposition that alleged damages that may be proven against a party asserting a possessory lien, if in excess of the value supporting the possessory lien, have the effect of nullifying the possessory lien.  Nor does he provide authority for the proposition that the sole remedy under federal law

is to obtain a court order for arrest of a vessel[3] and that there is no possessory lien under federal law.

Because Wilson cannot establish the second *prima facie* element—that he, not York Marine, had the right to possession of the Vessel at the time of the alleged conversion—York Marine is entitled to summary judgment on Wilson's claim of conversion.

## C.   Maine Unfair Trade Practices Act

Wilson alleges in Count V that York Marine and Michael York committed unfair or deceptive trade practices in violation of § 207 of the Maine UTPA by concealing their causation of damage to and the sinking of the Vessel and then using that as a basis to generate work and revenue to repair the damage they caused, and by billing for work not actually performed or authorized.  ECF No. 14 at 9-10.  York Marine argues that Wilson cannot pursue attorney's fees under the Maine UTPA because his underlying claim falls within maritime jurisdiction and therefore the applicable substantive law is the general maritime law of the United States.  ECF No. 64 at 14-17.  Wilson responds that his claim of fraudulent inducement to enter a contract to repair the Vessel, against York Marine and Michael York, is a non-maritime claim because the communications constituting the fraud took place on land.  ECF No. 83 at 15-18.  York Marine appears to seek dismissal of Count V as a

---

[3]  An Order of Arrest was issued by this Court on June 8, 2015 (ECF No. 24), in accordance with an order granting the Plaintiff's Motion for Issuance of Warrant of Arrest, filed on May 18, 2015 (ECF No. 22; ECF No. 5).  Wilson's conversion claim would pertain to the period prior to the Court-ordered arrest of the Vessel.

whole and to argue that Wilson cannot pursue a UTPA claim at all.  *See* ECF No. 64 at 17.[4]  The relevant case law indicates that whether a claim falls within maritime jurisdiction and whether remedies can be pursued under state law are distinct questions.  I first address whether Count V presents a maritime claim.

### 1. Maritime Claim

The First Circuit has recognized that whether a tort is maritime and therefore within admiralty jurisdiction "has traditionally depended upon the locality of the wrong[,]" but that there is an exception "when the tort has no maritime locality, but does bear a relationship to maritime service, commerce, or navigation."  *Carroll v. Prot. Mar. Ins. Co., Ltd.*, 512 F.2d 4, 6 (1st Cir. 1975) (quoting *Exec. Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 253, 259 (1972)); *see also Pino v. Prot. Mar. Ins. Co., Ltd.*, 599 F.2d 10, 12-13 (1st Cir. 1979); *Miller v. Penobscot Bay Med. Assocs.*, 836 F. Supp. 31, 34-35 (D. Me. 1993).  While the alleged statements by Michael York to Wilson that Wilson claims were fraudulent may have been made on land, the tort and unfair or deceptive trade practice that Wilson alleges—fraudulently inducing him to enter a contract with York Marine to repair his motor yacht, ECF No. 83 at 18—is "so interwoven with present and potential maritime contractual relationships" that it falls within admiralty jurisdiction.  *See Carroll*, 512 F.2d at 8-9.  Further, the impact of the alleged fraud is felt at sea, in the operation of the Vessel, where Wilson contends he is unable to enjoy and use the Vessel.  *See id.* at 17-18.  For that reason,

---

[4]  In its Motion for Partial Summary Judgment, York Marine refers to the UPTA claim as "Count IV."  ECF No. 64 at 17.  This appears to be a mistake; the UPTA claim is contained in Count V of Wilson's counterclaim.  ECF No. 14 at 9-10.

the authority cited by Wilson, *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.*, 874 F.2d 283, 289 (5th Cir. 1989) (finding no admiralty jurisdiction where the alleged tortious conduct, fraudulent inducement to sign contracts of affreightment for cargo aboard a ship, had not directly produced an injury occurring on navigable waters), does not support his claim.  *See* ECF No. 83 at 18.  Accordingly, Wilson's claim for which he seeks remedies under the Maine UTPA is a maritime claim and therefore falls within admiralty jurisdiction.

### 2.  Admiralty Law and the Maine Unfair Trade Practices Act

The next question then is how the applicable maritime law bears on the state law—provisions of the Maine UTPA, 5 M.R.S.A. §§ 207, 213—that Wilson seeks relief under.  York Marine asserts that the standard for an award of attorney's fees under the Maine UTPA differs from that for an award of attorney's fees or punitive damages under admiralty law, and that a conflicting state law must yield to the admiralty law.  ECF No. 64 at 15.  York Marine's argument is focused on the provision for attorney's fees in § 213(2) for a violation of § 207 and does not establish why Wilson cannot pursue a claim under the Maine UTPA at all.  *See id.* at 14-17.  In addition to attorney's fees, § 213 provides for actual damages, restitution, and equitable relief where necessary and proper, as well as fees and costs.  5 M.R.S.A. §§ 213(1), (2).

Wilson contends that "[s]tate statutes providing for [attorney's] fees are given [effect] in maritime cases where the [attorney's] fees are awarded incident to a dispute not normally [a] subject of maritime law."  ECF No. 83 at 17 (citing *Southworth Mach. Co. v. F/V Corey Pride*, 994 F.2d 37, 41 (1st Cir. 1993)).  Wilson

does not, however, provide argument or authority establishing that the dispute in this action is not normally a subject of maritime law.

Under 28 U.S.C.A. § 1333(1) (2016), referred to as the "saving to suitors" clause, "claimants in an admiralty case are not restricted to maritime relief and may also pursue remedies provided by state law," but under the constraint that "the substantive remedies afforded by the States [must] conform to governing federal maritime standards." *Southworth Mach. Co.*, 994 F.2d at 41 (citations and internal quotation marks omitted). "[W]here the subject-matter falls within the admiralty jurisdiction, state law may 'supplement' federal maritime law but may not directly contradict it." *Id.* (citations omitted).

Admiralty law provides that "a court has inherent power to assess attorneys' fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 250 (1st Cir. 1985) (internal quotation marks and citations omitted). In *Templeman*, where the plaintiffs sought attorney's fees under the Puerto Rico Rules of Civil Procedure, the First Circuit held that the case was not "a typical diversity case" in which the federal court would apply state substantive law. *Id.* Rather, federal admiralty law was the applicable law, and under federal admiralty law, the plaintiffs were not entitled to attorney's fees because they had contributed to the delays in the case. *Id.*

In *Southworth Mach. Co.*, the First Circuit reiterated its holding in *Templeman* but also recognized that "[s]tate statutes providing for attorney's fees may sometimes be given effect in admiralty cases, notably, where the attorney's fees are awarded

incident to a dispute that is not normally a subject of maritime law." *Southworth Mach. Co.*, 994 F.2d at 41. The First Circuit then gave as examples a case where "maritime law did not preempt a Rhode Island cause of action allowing recovery of damages and attorney's fees for an insurer's bad faith refusal to pay or settle claims" because "the refusal to settle claims is normally left untouched by maritime law" and a case where admiralty law did not foreclose claims under state handicap discrimination statutes because maritime law did not address handicap discrimination. *Id.* (citing *Pace v. Ins. Co. of N. Am.*, 838 F.2d 572, 578-79 (1st Cir. 1988); *Ellenwood v. Exxon Shipping Co.*, 984 F.2d 1270, 1280 (1st Cir. 1993)). The court then found that the state statutory attorney's fees provision invoked in the case, a part of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, could not be applied because the conduct that had been found to violate chapter 93A— breach of express warranty for parts and workmanship incident to the repair of a ship—"[fell] squarely within the focus of existing maritime law, and [the state provision], being inconsistent with maritime law, cannot be applied in this case." *Id.* at 42. The court thus affirmed the magistrate judge's ruling declining to award attorney's fees under chapter 93A because "such an award would conflict with federal maritime law under which the parties pay their own fees absent bad faith or oppressive litigation tactics." *Id.* at 41. The result was that the plaintiff could not seek attorney's fees under chapter 93A after prevailing on a claim of breach of chapter 93A. *Id.* at 42.

Here, the relevant state statutory attorney's fees provision, § 213(2) of the Maine UTPA, states that if the court finds in a private action commenced under § 213 that there has been a violation of § 207,[5] "the petitioner *shall . . . be awarded* reasonable attorney's fees and costs incurred in connection with said action."  5 M.R.S.A. § 213(2) (emphasis added).  This provision is inconsistent with admiralty law, under which the court has the power to award attorney's fees only when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[6]  *See Templeman*, 770 F.2d at 250 (internal quotation marks and citations omitted); *Southworth Mach. Co., Inc.*, 994 F.2d at 41-42.  *But see MT Baltic Commander Schiffahrtsgesellschaft MBH & Co. KG v. Mass. Port. Auth.*, 918 F. Supp. 2d 105, 112 (D. Mass. 2013) (finding that Massachusetts' chapter 93A and chapter 176D do not directly conflict with federal admiralty law with respect to attorney's fees because they require a finding of unfairness or deceit).  In this case, the conduct which is alleged to have violated the Maine UTPA centers on the manner in which Wilson was induced to enter into a maritime contractual relationship for the repair of a vessel and on which party is responsible for the partial sinking of the vessel.  Wilson has failed to establish that fraud of this type is a subject not addressed by maritime law, *see Southworth Mach. Co.*, 994 F.2d at 41-42, or a subject to which maritime law is

---

[5] Section 207 declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"  5 M.R.S.A. § 207.

[6] The Law Court has held that "an act may be deceptive, within the meaning of Maine's UPTA, regardless of a defendant's good faith or lack of intent to deceive."  *State v. Weinschenk*, 2005 ME 28, ¶ 18, 868 A.2d 200.  It is therefore possible to violate § 207 without acting "in bad faith, vexatiously, wantonly, or for oppressive reasons," and the attorney's fees provision of the Maine UPTA is accordingly inconsistent with admiralty law.

not always applied, *see MT Baltic Commander Schiffahrtsgesellschaft MBH & Co. KG*, 918 F. Supp. 2d at 110.  Rather, he has only advanced arguments that the claim is not a maritime claim because of where the alleged fraudulent communications took place, a contention that I have already addressed and rejected.  *See supra.*

Accordingly, I find that Wilson cannot pursue attorney's fees under the Maine UTPA against York Marine or Michael York.   However, his claim of unfair or deceptive practices brought under the Maine UTPA is not preempted by federal admiralty law.

## D.    Individual Liability of Michael York

Michael York is the president and principal shareholder of York Marine.  ECF No. 67 at 1, ¶ 2.  He seeks dismissal of Counts I (negligence), IV (conversion), and V (Maine UTPA) against him on the basis that Wilson has failed to provide allegations or record evidence in support of either of two modes of individual liability of corporate employees, (1) piercing the corporate veil or (2) individual acts of wrongdoing.  ECF No. 64 at 17-19 (citing, among other cases, *Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶¶ 24, 43, 44, 980 A.2d 1270).  Wilson argues in response that Michael York is subject to direct liability on the basis of his participation in wrongful acts, "separate and distinct from a veil-piercing remedy."   ECF No. 83 at 19.  Wilson makes no arguments or factual assertions in support of a theory of piercing the corporate veil. Accordingly, I address only whether Michael York can be held individually liable for his alleged tortious conduct under Counts I, IV and V of the counterclaim.[7]

---

[7] Michael York has not moved for summary judgment as to Count III of the counterclaim which asserts fraud against both him and York Marine.  Thus, I do not address Count III.

The parties disagree as to the applicable standard under Maine law for determining whether a corporate officer may be held individually liable for tortious conduct alleged to have been committed in furtherance of the corporation's interests. Michael York contends that a corporate officer may be held liable for tortious conduct committed by the officer only if the conduct involved "individual acts of wrongdoing apart from those of the corporation," ECF No. 64 at 19, citing *Town of Lebanon v. E. Lebanon Auto Sales, LLC*, 2011 ME 78, ¶ 8, 25 A.3d 950; *Blue Star Corp. v. CKF Properties, LLC*, 2009 ME 101, ¶¶ 44-48, 980 A.2d 1270; *Advanced Const. Corp. v. Pilecki*, 2006 ME 84 ¶¶ 13-14, 901 A.2d 189.[8] Wilson asserts that even though Michael York may have made the alleged misrepresentations in the interest of the corporation, "he cannot hide behind the form of the corporation to justify his wrongdoing." ECF No. 83 at 19. Thus, the question presented is whether a corporate officer can be held individually liable for actions undertaken in furtherance of the corporation's interests. The answer is found in *Pilecki*.

In *Pilecki*, a corporate home builder sued to collect money in connection with a home construction contract. 2006 ME 84, ¶ 1. The defendant homeowners counterclaimed against the corporation and its president on various theories, including a violation of the Maine UTPA. *Id*. Following a trial, the jury awarded the homeowners damages on their Maine UTPA claim against the corporation and its president, jointly and severally. *Id*. In affirming the jury's verdict for the UTPA

---

[8] Michael York also cites to an unpublished federal decision which, because it is unpublished, I do not address further.

violation, the Maine Law Court recognized that "[c]orporate employees who commit an unfair trade practice within the scope of their employment can . . . be held personally liable" independent of having pierced the corporate veil. *Id*. at ¶ 13. The court also explained that actions pursuant to the Maine UTPA sound in tort; that the president of a corporation is an agent of the corporation; and that "[i]n an action for the tortious conduct of an agent, both the agent and the principal can be held liable." *Id*. at ¶ 16.

Michael York does not address *Pilecki*'s discussion of joint and several liability, resting his argument instead primarily on a footnote in *Town of Lebanon*, 2011 ME 78, n.3. *See* ECF No. 64 at 19. A review of that decision is required in order to explain his argument.

In *Town of Lebanon*, a town sued a limited liability company ("LLC") and its sole owner for violations of the junkyard and automobile graveyard statute, 30-A M.R.S. §§ 3571-3760 (2010). 2011 ME 78, ¶ 1. The trial court entered judgment against both defendants. *Id*. On appeal, the Law Court vacated the judgment as against the individual owner, and affirmed the judgment as to the LLC. *Id*. The court analyzed whether there was a basis for disregarding the corporate form—the LLC—to subject the LLC's sole member to individual liability. Applying the criteria for piercing the corporate veil, the court concluded that the LLC's sole member could not be individually liable because there was no evidence that the individual owner had abused the privilege of incorporating or that an unjust result would occur if only the LLC were held liable. 2011 ME 78, ¶ 9. The court did not address whether,

24

separate from piercing the corporate veil, the sole member of the LLC could be individually liable for tortious conduct he or she committed in furtherance of the LLC's interests.  *Id.* at ¶¶ 9-10.

In *Town of Lebanon*, the court observed in a footnote that there was no "evidence [nor] a finding that [the LLC's sole owner] undertook any individual acts of wrongdoing distinct from those of the LLC."  *Id.* at ¶ 9 n.3.  It is this language upon which Michael York rests his argument that there can be no individual liability for a corporate officer whose alleged tortious conduct was committed in furtherance of the corporation's interests.  The footnote contains a citation to paragraph 44 of *Blue Star Corp.*, which, citing *Pilecki*, recognized that corporate officers can be held liable for their individual acts and that that liability is distinct from liability arising from piercing the corporate veil.  *See* 2009 ME 101 at ¶ 44.

In *Town of Lebanon*, the court did not consider whether there can be joint and several liability for an LLC and its owners based on tortious acts committed by the owner in furtherance of the LLC's interests.  Thus, the footnote upon which Michael York rests his argument did not overrule *Pilecki*'s statement that a president of a corporation is an agent of the corporation, and that both an agent and principal can be held liable for the tortious conduct of the agent.

Any doubt as to the import of the footnote in the *Town of Lebanon* decision is erased by the Maine Law Court's more recent decision in *Faith Temple v. DiPietro*, 2015 ME 166, 130 A.3d 368.  In *Faith Temple*, a church filed a complaint in state court seeking to enforce a money judgment previously issued by the U.S. Bankruptcy

Court.  *Id*. at ¶ 1.  The defendant counterclaimed against the church and its former pastor on a variety of theories, including negligent and intentional infliction of emotional distress.  *Id*. at ¶ 5.  The trial court ordered the dismissal of the counterclaims as against the former pastor.  *Id*. at ¶ 7.  On appeal, the Maine Law Court held that the trial court erred in dismissing the claims brought against him because the claims alleged that the former pastor was himself engaged in actionable conduct, even though he may have acted for the corporation when he allegedly committed the torts.  *Id*. at ¶ 34.  In a footnote, the court explained the footnote from the *Town of Lebanon* decision which is the foundation of Michael York's argument in this case:

> Stearns [(the defendant)] relies on a footnote in *Town of Lebanon v. E. Lebanon Auto Sales LLC,* 2011 ME 78, ¶ 9 n. 3, 25 A.3d 950, for the proposition that, for an individual agent of a corporation to be held liable, the individual's wrongful act must be distinct from any acts taken as an agent of the corporation. Stearns misconstrues that discussion. In that footnote, we concluded that an individual who was the sole member of an LLC could not be held individually liable for corporate wrongdoing because the plaintiffs had not proved "any individual acts of wrongdoing distinct from those of the LLC." *Id.* (citing *Blue Star Corp. v. CKF Props., LLC,* 2009 ME 101, ¶ 44, 980 A.2d 1270). In *Town of Lebanon,* there was no suggestion that the individual herself engaged in any individual wrongful acts, either on her own or acting as an agent of the corporation, and thus she could not be held personally liable pursuant to the theory of agency liability articulated in *Blue Star.* As we discuss in the text, *Town of Lebanon* therefore does not protect Stearns from liability here, because DiPietro's counterclaim alleges that Stearns personally committed tortious acts for which he can be held liable, regardless of whether he was acting as the agent of a corporation.

*Id*. at n.11.

    Here, because Wilson contends that Michael York personally made material misstatements which he knew to be false, it makes no difference if

Michael York was allegedly acting in the interests York Marine.  Accordingly,

Michael York is not entitled to summary judgment as to counts I, IV, and V of

the counterclaim.

## IV. CONCLUSION

For the foregoing reasons, York Marine, Inc. and Michael York's motion for

partial summary judgment (ECF No. 64) is **GRANTED IN PART** as follows:

> (1) On Counts I (Negligence), II (Breach of Warranty), III (Fraud), and V (Maine Unfair Trade Practices Act), Defendant John T. Wilson may not obtain damages for the alleged diminution in value of the Vessel or damages associated with the swim platform.  Any damages shall be limited to the cost of repairing the engine and deck.

> (2)  On Count IV (Conversion), judgment is granted for Plaintiff, York Marine, Inc., and third-party defendant, Michael York.

> (3)  On Count V (Maine Unfair Trade Practices Act), Defendant John T. Wilson may not obtain attorney's fees pursuant to the Maine Unfair Trade Practices Act.

The motion is **DENIED** in all other respects.

**SO ORDERED.**

Dated this 26th day of September, 2016.

**/s/ Jon D. Levy**
**U.S. DISTRICT JUDGE**
